[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 12749
This action for termination of parental rights concerns the interests of Jeffrey F., a minor child whose date of birth is November 26, 1989. The petitioners in this proceeding are John C. and Deborah C. of Newington, Connecticut, the child's legal guardians. The respondents are Jeffrey's biological parents, Bettina D. and Jeffrey F.
Pursuant to the provisions of C.G.S. § 45a-717 (g), the petitioners alleged three statutory grounds for termination of parental rights: acts of parental commission or omission which have denied the child the care, guidance or control necessary for his physical educational, moral or emotional well-being; lack of an on-going parent-child relationship; and parental failure to achieve the necessary degree of personal rehabilitation. The TPR petitions alleged that each of the foregoing grounds existed for a period of time not less than one year prior to November 6, 1996, when the action was commenced.
PROCEDURAL CONTEXT
The Department of children and Families (DCF) received a referral concerning Jeffrey F. in April 1992. In October 1992, Christa D., the child's maternal grandmother, received temporary guardianship of Jeffrey from the Probate Court.
DCF received an ex parte order for the child's temporary custody on March 23, 1993 from the Superior Court for Juvenile Matters in Hartford. Jeffrey was removed from his grandmother's care and placed in a foster home at that time. The OTC was confirmed by the court following a contested hearing on May 23, 1993. Jeffrey was thereafter placed in the home of John C. and Deborah C., who had initially offered to serve as a relative foster home placement.[1]
On March 4, 1994, the parents and the maternal grandmother entered nollo contendere pleas to allegations that Jeffrey F. was a neglected child, before the Superior Court for Juvenile Matters. At that hearing, the court (Mulcahy, J.) entered neglect adjudications and transferred the child's guardianship to John C. and Deborah C. The child has remained under their guardianship and care continuously since March 4, 1994. CT Page 12750
The termination of parental rights petitions were initially filed with the Probate Court for the District of Newington on November 6, 1996. Pursuant to C.G.S. § 45a-715 (g), the Probate Court transferred the matter to the Superior Court for Juvenile Matters in Plainville. The case was subsequently transferred to this venue for trial.
Prior to trial, various motions were considered by this court at a hearing on June 17, 1997. On that date, the court denied the respondent father's motion for continuance, and the maternal grandmother's motion to intervene in the matter.
The termination of parental rights trial began at the Child Protection Session in Middletown on July 9, 1997. Prior to the commencement of evidence and testimony on that date, Bettina D. filed an affidavit consenting to the termination of her parental rights.[2] A separate hearing on the issue of the mother's consent was held on July 9th before the Honorable Francis J. Foley. The mother, and her court-appointed counsel, were present. Bettina D. was advised of her rights and canvassed by Judge Foley. The court accepted the biological mother's consent, after finding that her decision to do so was knowingly and voluntarily made.
The trial commenced on July 9, 1997 before this court, and was continued on July 11, August 21, August 28 and August 29, when the matter concluded.
The respondent father and his counsel were present throughout the proceeding, as were the attorneys representing the petitioners, and the minor child. Bettina D., and her counsel, did not participate in the proceeding after the mother's affidavit of consent was accepted by Judge Foley.
At trial, the petitioners, John C. and Deborah C., both testified. They also called the following witnesses to testify:
1. Karen Brinkman, DCF Social Worker;
2. Joan Guerrera, the child's therapist;
 3. Dr. David Mantell, court-appointed psychological evaluator;
4. Christine H., Deborah C.'s cousin. CT Page 12751
The petitioners also offered five full exhibits into evidence.
The respondent father, Jeffrey F., submitted six exhibits into evidence, and testified on his own behalf at trial. He also called two witnesses, Ronda K. and Gil P., to testify.
Counsel for the minor child did not introduce the testimony of any witnesses. She offered one exhibit, which was marked for identification, but not admitted into evidence.
At the commencement of trial, the petitioners' counsel requested that the court take judicial notice of several documents from the neglect proceeding which are in the court file. The court granted the motion with respect to a March 4, 1994 annotation summarizing the grounds for adjudication and the disposition in the neglect trial. It denied the request for judicial notice of a May 25, 1993 social study and a report by Dr. Freedman under date of July 12, 1993.
Following the conclusion of evidence and testimony on August 29, 1997, the parties requested and received additional time to submit memoranda of fact and law. Briefs were filed by the respondent father on September 26, 1997, and by counsel for the minor child on September 29, 1997. Counsel for the petitioners did not submit a post-trial memorandum. The court has carefully reviewed and considered the briefs which were submitted.
FACTUAL FINDINGS
The court, having carefully weighed all of the evidence introduced at trial, makes the following factual findings:
The minor child was adjudicated by the court as neglected on March 4, 1994. This finding was rendered after the maternal grandmother and both parents entered nollo contendere pleas to an allegation that young Jeffrey had been permitted to live under conditions or circumstances injurious to his physical or emotional well-being. (Court Record, March 4, 1994).
The neglect allegation stemmed from an incident in March 1993. Bettina D. had been located by police in a locked car, injecting heroin into her arm. The child, then age three, was asleep in the vehicle at the time. (Petitioner's Exhibit 1, Page 6). The biological father had separated from the biological CT Page 12752 mother in 1992, and did not have custody of that child at that time (Testimony of Jeffrey F.). DCF obtained an ex parte order of young Jeffrey's custody. He was placed in a state-licensed foster home at first. He was subsequently transferred to the care of John C. and Deborah C., after the couple initially offered to serve as a relative foster-care resource.
Jeffrey's guardianship was subsequently transferred to John C. and Deborah C. at the neglect hearing on March 4, 1994. The child has remained under their guardianship and care through the present time.
Written expectations were not set for either parent at the March 4, 1994 hearing at the Superior Court for Juvenile Matters in Hartford. Because Jeffrey was not committed to DCF, that agency did not offer post-adjudication services to either respondent parent. A record of the neglect hearing indicates that the court reserved jurisdiction as to visitation for a period of 90 days after the hearing. (Court Record, March 4, 1994).
Jeffrey F. began visiting the child in 1993 at his initial foster home placement, and then subsequently at the home of John C. and Deborah C. The father's visitation there continued after the neglect adjudication and transfer of guardianship in March 1994.
For a short period of time after the neglect hearing, Jeffrey F. was permitted overnight visitation with his son. Deborah C. stopped the overnight visitation because young Jeffrey allegedly witnessed the father engage in an act of domestic violence towards the father's girlfriend. The father was thereafter permitted to see the child for day visits, which generally took place on Saturdays or Sundays from 10 a.m. until 6 p. m.
Deborah C. believed the biological father had been drinking, or was inebriated, on several occasions when he visited with his son. She introduced a journal (Petitioners' Exhibit 3) in which she made entries about the father's visits. The journal entries contained several references to the father's alleged drinking and also noted the petitioner's complaints about the respondent arriving early or late for visits. (Petitioners' Exhibit 3).
Deborah C. estimated during her testimony that Jeffrey F. visited his son 48 times during the period between June 2, 1994 CT Page 12753 and March 16, 1996. She testified that she provided the father with a listing of Jeffrey's athletic events and invited him to attend. Counting those games, the petitioner estimated that the father had 132 opportunities for contact with his child during the period referred to above.
In September 1995, Deborah C. refused to permit the father to have unsupervised visits with the child due to, her concerns about the father's substance abuse, lifestyle, alleged domestic abuse and criminal arrests.
She subsequently stopped all visits between the biological father and young Jeffrey. She claimed that Jeffrey F. had failed to see the child for three consecutive months prior to the time when the visits were stopped. The petitioner informed Jeffrey F. that his visitation would remain suspended until the father could establish that he was a "decent citizen" by avoiding criminal arrests, and by showing that he would abstain from using alcohol during visits.
It is unclear to the court as to precisely when the father's visits were completely cut off by the petitioners. A report from Dr. David Mantell, the court-appointed psychological evaluator notes:
 "The guardians told me that they stopped the father's visits in December of 1995 because he would show up drunk, came irregularly and would tell Jeff that they were not his parents and that their children were not his siblings."
(Petitioners' Exhibit 5, Page 2).
The court does not accept Deborah C.'s assertion that the father failed of his own volition to visit young Jeffrey for three consecutive months prior to the date when the petitioners shut off his contact. Deborah C.'s journal indicates that on October 14, 1995 the father visited his son and "showed up with a new bike" for the boy. (Petitioners' Exhibit 3, Entry dated October 14, 1995). John C. testified at trial that the father's visits stopped around Christmas in December 1995 and that there had been no major gaps in his contacts with the child prior to then. Jeffrey F. testified at trial that the last time he saw his son in the guardians' home was in December 1995, and that he brought his son a "Big Foot" toy as a gift on that occasion. The CT Page 12754 father also testified that he did not see his son again until November 1996, when he surreptitiously attempted to see young Jeffrey at his bus stop on the child's birthday.
Deborah C. claimed that around the time she terminated the father's visitation, she discussed this action with the child's therapist, Joan Guerrera, who concurred with the guardians' decision to do so. John C. testified that the guardians stopped all visitation based on the recommendation of young Jeffrey's psychologist. The foregoing testimony was contradicted, however, by the testimony of the therapist, Ms. Guerrera.
Ms. Guerrera holds a masters degree in social work and was called as a witness by the petitioners. It was stipulated by the parties at trial that she is an expert in child and family therapy. She testified that she saw young Jeffrey from September 21, 1995 through September 27, 1996. Ms. Guerrera was consulted by the guardians to evaluate concerns about the child's reaction to things which were said to him during visits by the father. (Testimony of Ms. Guerrera).
Other than during an encounter which she had when the child went with Deborah C. and Jeffrey F. to a store, Ms. Guerrera never observed the child interact with his biological father. She never interviewed the father, and never evaluated the parent child relationship in a clinical setting.
Ms. Guerrera testified that the child appeared emotionally flat when referring to the biological father in her sessions, and that the child never initiated conversations about him. She found young Jeffrey to be a happy and fairly well adjusted child.
Ms. Guerrera did not recall Deborah C. asking her about stopping the biological father's visitation. She also testified that she never recommended to the guardians that Jeffrey F.'s contacts be stopped completely. She did speak with the guardians about whether the child should go with the father if Jeffrey F. showed up intoxicated for a visit.
The court accepts Ms. Guerrera's testimony on this issue as credible. Based upon her testimony, the court concludes that the guardians were not acting upon professional recommendation, nor with the approbation of the child's therapist, when they completely severed Jeffrey F.'s contacts with his son. CT Page 12755
The guardians never filed motions with either the Probate Court, or the Superior Court for Juvenile Matters, to address their concerns about the father's contacts, or to seek restrictions, such as an order of supervised visitation, or alcohol conditions.
During the period between March 4, 1994 and November 6, 1996, Jeffrey F. was convicted of three crimes. He paid fines as a result of his convictions for the offenses of criminal mischief, third degree, and larceny, 6th degree. He received a suspended sentence of three years, and three years probation, for an assault second degree conviction.[3]
During the period of time which followed the transfer of guardianship, Jeffrey F. did not pay child support for young Jeffrey. No evidence was presented at trial that he was ever ordered to do so by a court, or requested to do so by the guardians. He did purchase a bicycle, a motorized jeep and other toys for the child. (Testimony of Deborah C. and Jeffrey F.). The father took the child on day trips to Riverside Park and Lake Compounce, and on a fishing excursion, when he was permitted unsupervised visits.
Jeffrey F. claimed at trial that he never went more than a couple of weeks without seeing his son when he was allowed visitation. The court accepts this testimony as credible. A review of the journal kept by Deborah C. indicates approximately 30 visits with the child by the father during the period between June 1994 and October 1995 (Petitioner's Exhibit 3). The father offered pictorial evidence, which the court also accepts as credible, that he took young Jeffrey on the various trips, and engaged in other recreational activities with him, when he visited his son during this period of time. (Respondent Father's Exhibits A-F).
There was no evidence at trial that Jeffrey F. ever physically abused or mistreated the child. The petitioner claimed that young Jeffrey appeared fearful of his father after some of the visits. The petitioners also alleged that young Jeffrey witnessed the father assault Bettina D. when the parents lived together. They further alleged that the child saw his father engage in domestic violence towards a former girlfriend named Renee. Dr. Mantell, the court-appointed psychologist, did not evaluate the child's interaction with Jeffrey F., because he believed the contact would be adverse to young Jeffrey's best CT Page 12756 interests. Ms. Guerrera, who was consulted by the petitioners to evaluate problems with visitation, did not conduct a clinical assessment of the child's relationship with Jeffrey F. Dr. Mantell concluded that young Jeffrey has no memory of having lived with his biological father. Given the foregoing, the court is unable to make any finding that the child is fearful of his biological father, or that he was psychologically traumatized by witnessing the father's conduct.
Jeffrey F. has resided with his girlfriend, Ronda K., and her children, for approximately three years. He is self-employed as a home improvement contractor and has supported himself through this business for the past several years.
During the psychological evaluation, Jeffrey F. admitted to Dr. Mantell that he had been incarcerated around the time of young Jeffrey's placement in foster care:
 "The father told me that he was incarcerated at Hartford Correctional Center at the time for attempted arson. I asked him to explain that charge since he had not explained any of his charge and arrest circumstances when previously canvassed. He told me that Bettina was busy getting high one night with dope, that he never intended to hurt anyone and that he stressed the point and pleaded [to] attempted arson to get out of jail. I asked the father to tell me the point that he stressed. He said it was for Bettina to stop selling heroin. I asked him to explain how he stressed it. He said he did so [to] the dealer [by] putting a gallon of gas by the door and that the fire department was called. I asked whether gas is the stress he referenced. He said "yes." (Petitioners' Exhibit 5, Page 4).
During the psychological evaluation, which was conducted in February 1997, the biological father admitted past substance abuse problems, but claimed that he was now rehabilitated:
 "His drug usage includes marijuana, cocaine and heroin, which he said he discontinued a couple of years ago or more. He likes beer and last drank a six pack the weekend before our interview. He had a DWI at 19, and six months ago. He lost his license, which he hopes to regain in May." (Petitioners' Exhibit 5, Page 6).
Jeffrey F. also made the following disclosure to Dr. Mantell: CT Page 12757
 "He told me he's had some substance abuse treatment at New Britain General Hospital and has attended some NA and AA meetings, most recently in August. He denies that he ever went to the guardian's home intoxicated, or with beer in his hand, denies that he ever hit Bettina in front of Jeffrey, and then told me that he didn't think that he had Jeffrey at his home for more than two or three times before the visits were cut back." (Petitioners' Exhibit 5, Page 8).
Jeffrey F. denied at trial that he had visited the child while intoxicated, or after drinking. He maintained that Deborah C. was wrong when she testified that she had smelled the odor of alcoholic beverage upon his person during several visits with young Jeffrey, and claimed that the guardian had confused the scent of his cologne with the smell of liquor. The court finds that the respondent's testimony on this issue was evasive, and believes that the respondent did continue to abuse alcohol.
The court accepts as credible Deborah C.'s testimony that she observed Jeffrey F. intoxicated, or with intoxicants on his breath, during several of the visits. The biological father's 1996 conviction for driving while impaired, his admission that he had attended AA and NA meetings and substance abuse treatment at New Britain General Hospital, and his statement that he still drinks beer leads the court to conclude that he has not yet conquered his problem with alcohol.
ADJUDICATION OF JEFFREY F. (BASED ON FACTS THROUGH NOVEMBER 6, 1996)
1. acts of Parental Commission or Omission: C.G.S. §45a-717 (g)(2)(B) provides that this statutory ground for termination applies in those cases where the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being."
The statute authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child. In re:Kelly S., 29 Conn. App. 600, 614, 616 A.2d 1161 (1992). See also: In Re: Theresa S., 196 Conn. 18, 25-27, 491 A.2d 355
(1985); In re: Sean H., 24 Conn. App. 135, 144-145,586 A.2d 1171, cert. denied 218 Conn. 904, 588 A.2d 1078 (1991). This section of the TPR statute "requires proof of specific conduct CT Page 12758 that has caused serious injury to the child." In re: Kelly S.,
supra, 616; In re: Theresa S., supra; In re: Nicolina T.,9 Conn. App. 598, 520 A.2d 639 cert. denied, 203 Conn. 804, 525 A.2d 519
(1987).
The petitioners did not prove at trial that the child ever suffered serious physical or emotional injury from either parent.
"The legislative history of [this section of the statute] makes it clear that it was added to the law so that seriously abused children could be permanently removed from the care of the parent inflicting such abuse." In re: Luke G.,40 Conn. Sup. 316, 324 (1985).
Because there was no act of serious physical or emotional injury to the child, the petitioners failed to prove this ground for termination by clear and convincing proof. Accordingly, this count of the petition against the biological father is hereby dismissed.
2. Lack of On-going Parent-Child Relationship:
Pursuant to C.G.S. § 45a-717 (g)(2)(C), this ground for termination exists when the court determines that there is "no on-going parent-child relationship," and that "to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child." The statute defines an ongoing parent-child relationship as "the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child."
"This ground, as applied-to non-custodial parents, must be interpreted in the light of circumstances that actually pertain where children only see such parent during permitted visitation."In re: Luke G., supra, 325 (1985).
Young Jeffrey told Dr. Mantell that he had three fathers: his guardian, John C.; a man named Arnie; and a person to whom the child referred as "D.D." The psychologist was unable to elicit the identity of "D.D." in follow-up questions, and the child gave Dr. Mantell conflicting answers as to whether or not he remembered Daddy "D.D." Dr. Mantell testified that the child did not know a daddy named Jeffrey, or Jeffrey F. CT Page 12759
However, there was credible evidence at trial that young Jeffrey had called his biological father by the name "Da Da." (Testimony of Jeffrey F., and Gil P.). There was also credible evidence that the child had been given a bicycle and motorized jeep by his biological father when the child was five or six years old, and that the father had engaged in memorable activities with the child in the past. These included trips to amusement parks, a fishing excursion, and building a purple dinosaur snow figure. The child had between 30 and 48 visits with the biological father prior to the suspension of those contacts by the guardians.
In cases such as the present one, the ultimate question which must be decided by the court is whether or not the child has "present memories or feelings" for the natural parent which are "positive in nature." In Re: Juvenile Appeal (Anonymous),177 Conn. 648, 670, 420 A.2d 875 (1979); In re: Juvenile Appeal(Anonymous), 181 Conn. 638, 646, 436 A.2d 290 (1980); In re:Juvenile Appeal (84-6), 2 Conn. App. 705, 709, 483 A.2d 1101
(1984).
Dr. Mantell testified at trial that he did not see evidence of an ongoing parent-child relationship between Jeffrey F. and the minor child. He noted in his written report that:
 "The history of this matter and my conversations with the child and parents indicate that there is no reason to expect a parent-child relationship to exist between them. Neither parent has cared for the child parentally in over four years." (Petitioners' Exhibit 5, Page 10).
Despite the foregoing opinion, the court is not persuaded that no parent-child relationship existed between Jeffrey F. and his son for one year prior to the commencement of this action. The determinative factor is whether or not the child has positive memories of, or feelings about, his biological parent, and not whether or not the child has been in the father's parental care.
The court notes the similarity between the child's statement about having a father figure named "D.D." and his prior references to Jeffrey F. as "Da Da." The court is mindful of the testimony of Deborah C., who stated that young Jeffrey remembers his biological father as a buddy who used to come by to see him. Finally, the court notes that neither Dr. Mantell, nor any other CT Page 12760 professional associated with this case, observed the father interact with the child in an effort to assess whether or not on going ties existed between the two. Based on these facts, and given the number of times Jeffrey F. visited regularly with his son prior to December 1995, the court is not convinced that young Jeffrey totally lacks any positive feelings or memories concerning his biological father.
Based on all of the foregoing, the court finds that the petitioners did not prove by clear and convincing proof the allegation that no ongoing parent-child relationship existed. This count of the TPR petition against Jeffrey F. is, therefore, also dismissed.
 3. Parental Failure to Rehabilitate: This statutory ground for termination of parental rights exists where the court determines that:
 "The parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assure a responsible position in the life of the child . . ." C.G.S. § 46a-717 (g)(2)(D).
 Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. In re: Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986). A responsible position in the life of a child is not necessarily the same thing as a full-time caretaker, and the termination statute does not require that a parent must assure full-time responsibility for a child's care or suffer a termination of parental rights. In re: Migdalia M., supra, 206 (quotation marks omitted).
Young Jeffrey was removed from parental custody in 1992 and went into foster care in 1993. He was adjudicated as a neglected child on March 4, 1994.
Viewed in its totality, the evidence at trial established that the biological father was convicted of several crimes which resulted in fines or suspended sentences during the period from the neglect adjudication to the filing of the termination. petition. He continued to have a problem with alcohol abuse CT Page 12761 during this period. The evidence also established that he has been gainfully employed for several years, has resided with his current girlfriend for three years, and consistently attempted to maintain meaningful contacts with young Jeffrey until approximately December 1995, when his visits were stopped by the petitioners.
Deborah C.'s testimony, and her journal, proved that the biological father saw young Jeffrey approximately two times per month until the visitation was cut off. The pictorial evidence introduced by the respondent established that the father attempted to engage in appropriate activities for a child of young Jeffrey's age during those contacts.
Although Jeffrey F. did not pay child support, he did purchase gifts for the child, such as a motorized jeep and a bicycle. The father went to the bicycle store with the guardian, Deborah C., and young Jeffrey, several months before the visits were ended.
It is a fact that Jeffrey F. has engaged in illegal conduct, and has not been a model parent. But in addressing this statutory ground for termination, the court must find by clear and convincing evidence that the respondent cannot assume a responsible position in the life of the child within a reasonable time, as a result of his failure to achieve personal rehabilitation. The evidence adduced at trial does not support such a finding.
The court finds that Jeffrey F. has made progress on the continuum of personal rehabilitation. The court further finds that this non-custodial parent demonstrated an ongoing interest in the child — reflective of his attempts to maintain a responsible position in young Jeffrey's life — until all visits were unilaterally terminated by the guardians.
The court recognizes that the petitioners had valid concerns for the child's safety on those occasions when the father had been drinking before, or during visits. But it also finds the complete termination of all contacts between Jeffrey F. and the minor child was inappropriate. Those issues should have been addressed through appropriate motions to the court for such relief as supervised visitation, or an order requiring the father to completely abstain from alcohol during his contacts with the child. CT Page 12762
The petitioner did not prove by clear and convincing evidence that, for a period of one year prior to November 6, 1996, the biological father had failed to rehabilitate as alleged in the TPR petition. The court is unable to find by clear and convincing evidence, as of the date of filing, that the respondent father could not assume a responsible position in young Jeffrey's life within a reasonable time. This count of the termination petition is, therefore, also dismissed.
ADJUDICATION OF BETTINA D. (BASED ON FACTS THROUGH NOVEMBER 6, 1996)
Bettina D., the biological mother of the minor child, has filed with the court an affidavit consenting to the termination of her parental rights. This court takes judicial notice of Bettina D.'s affidavit, which was subscribed under oath and filed on July 9, 1997. The court also takes judicial notice of the fact that Judge Foley canvassed Bettina D. in court on July 9th, and found that Bettina D.'s consent to termination was knowingly and voluntarily given.
Per C.G.S. § 45A-717 (b), the court may grant a petition for termination of parental rights if it finds, based upon clear and convincing evidence that "the termination is in the best interest of the child" and that "such parent has voluntarily and knowingly consented to the termination of the parents' parental rights with respect to such child."
The court finds by clear and convincing evidence that the biological mother consented to the termination of her parental rights. Based upon its review of the affidavit of consent which was filed with the court, and of the court records pertaining to Judge Foley's findings, the court also finds by clear and convincing evidence that Bettina D.'s consent to termination was knowingly and voluntarily made.
DISPOSITION AS TO BETTINA D., ONLY (BASED UPON EVIDENCE THROUGHTHE CONCLUSION OF TRIAL
The court has found that a ground for termination of parental rights was proven by clear and convincing evidence with respect to the biological mother. The court now addresses the issue of disposition as to that respondent. During this portion of the proceeding, the petitioners are required to prove by clear and convincing evidence that termination would be in the best CT Page 12763 interests of the minor child.
Young Jeffrey was taken from the biological mother's physical custody in 1992. He was adjudicated as a neglected child based on the March 1993 incident during which he was found in a car with the mother, who was injecting heroin at that time.
At the time of Bettina D.'s evaluation by Dr. Mantell in March 1997, the biological mother was incarcerated at Niantic Correctional Institution. (Petitioner's Exhibit 5, Page 4). She was imprisoned for violation of probation, as the result of her continued use of illegal drugs. (Petitioner's Exhibit 5, Page 4). Bettina D. was released from prison in the summer of 1997. She told Dr. Mantell in March 1997 that she was unable to care for young Jeffrey due to her incarceration, but wanted visitation with the child. As noted above, she subsequently consented to the termination of her parental rights at the outset of this trial.
According to the DCF Social Study, Bettina D. had two other children (by a different relationship) after young Jeffrey was born. Both were born addicted to drugs. The social study notes:
 "Bettina used drugs throughout both pregnancies as mentioned and was never in any treatment program. The Department of Children and Families was involved with her, but by her own admission she could not stop using drugs. Bettina admits to prostituting for drugs, and that they came first. She had no prenatal care for the children, and she finally got arrested and incarcerated in June of 1996. This was for violation of probation. (Petitioner's Exhibit 1, Page 6-7).
The court finds that the biological mother's unfortunate and severe chronic drug dependency has consistently rendered her unable to parent young Jeffrey, or assume a reasonable position in the life of the child. The heroin abuse which resulted in the child's 1993 placement in state care continued until June 1996, when she was incarcerated for a year. The mother, although initially opposed to termination, has now consented to it.
Based on all of the foregoing, the court finds by clear and convincing evidence that termination of this respondent's parental rights would be in the best interests of young Jeffrey. Because the statutory ground for termination is consent, the court is not required to make the six dispositional findings with CT Page 12764 respect to Bettina D. which would otherwise be required under C.G.S. § 45a-717 (i).
JUDGMENT AND ORDERS
Having determined that the respondent mother Bettina D. has validly consented to the termination of her parental rights, and having further found by clear and convincing evidence that termination is in the best interests of the minor child, the court hereby orders that Bettina D.'s parental rights with respect to the child Jeffrey F. be, and hereby are, terminated.
The court has found that the petitioners failed to prove by clear and convincing evidence the three statutory grounds for termination alleged against the respondent father, Jeffrey F. Accordingly, the termination petition with respect to this respondent is hereby dismissed.
The court notes that this decision deals only with the issue of termination of parental rights, and does not address such separate and distinct legal matters as the minor child's guardianship, custody or visitation. The court also notes that the dispositional evidence which was introduced during this non bifurcated trial clearly suggests that the minor child has a close emotional bond with his guardians, whom he regards as his psychological parents. The court commends the petitioners for the appropriate and loving care which they are rendering to young Jeffrey.
In the event that matters relative to the guardianship or visitation of the child should hereafter be brought before some other venue with respect to the biological father, it is respectfully recommended that the court consider issuing the following orders in connection therewith:
 a. an order that the biological father pay regular, periodic child support payments to the guardians, in conformance with state guidelines;
 b. a comprehensive, court-ordered evaluation of the biological father's substance abuse issues, including an assessment of any current need for drug/alcohol treatment;
 c. an assessment of the biological father's interaction with the child, by an evaluator not already CT Page 12765 associated with this case (unless that professional deems such an evaluation adverse to the child's best interests);
 d. the issuance of written, court-approved expectations delineating the conduct and specific rehabilitative efforts which will be expected of the biological father.
Dated at Middletown, Connecticut this 29th day of December, 1997.
BY THE COURT Dyer, J.